OB7LDabH

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                         24 Cr. 514 (ER)

5    FAREED DABIDAH,

6                                         Hearing
                   Defendant.
7    ------------------------------x

8                                         New York, N.Y.
9                                         November 7, 2024
                                          2:20 p.m.
10

11   Before:

12                   HON. EDGARDO RAMOS,

13                                         District Judge

14                        APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  JUN XIANG
17        Assistant United States Attorney

18   TAMARA L. GIWA
          Federal Defenders of New York, Inc.
19        Attorneys for Defendant
     BY:  KRISTOFF I. WILLIAMS
20

21
     Also Present:  Meherun Mayer, Pretrial Services
22

23

24

25

OB7LDabH

1          (Case called)

2          MR. XIANG:  Good afternoon, your Honor.  Jun Xiang for

3   the government.  And I sincerely apologize for the delayed

4   start.  I miscalendared the start time.

5          MR. WILLIAMS:  Good afternoon, your Honor.  Kristoff

6   Williams for Mr. Dabidah.  Also present in the courtroom is his

7   mother.

8          THE COURT:  Good afternoon to you all.

9          This matter is on for a bail hearing.  Mr. Dabidah was

10  arrested on August 15.  I believe that at that time Magistrate

11  Judge Sarah Cave determined that he should be remanded on the

12  basis of dangerousness and, I believe, also flight.

13         And Mr. Williams, you want me to revisit that

14  determination?

15         MR. WILLIAMS:  Yes, your Honor.

16         THE COURT:  Okay.  I am happy to hear you.

17         You can remain seated, by the way, if you wish.

18         MR. WILLIAMS:  Thank you, your Honor.

19         We submitted a written letter, but to respond to some

20  of the things that the government says, the government has

21  alleged that Mr. Dabidah over the course of two years has

22  ordered and stockpiled 3-D printed firearms and firearm

23  components.  On that basis, they believe he is a danger.

24         However, that is a rather large sample size, and over

25  that two-year period, the government cannot present a single

1  instance of Mr. Dabidah selling those firearms, using those

2  firearms in a violent manner, or even threatening to use those

3  firearms.  And with the sample size that large, I do believe

4  that if that was the intent, something concerning would have

5  popped up within that two-year period.  And the reason it has

6  not is because Mr. Dabidah is not a firearms trafficker.  He is

7  not a violent or dangerous individual.  Rather, as he told

8  officers during his post-arrest statement, this is a young man,

9  22 years old, very impressionable, who gained an interest in

10  3-D printed firearms after exposure on social media.

11             THE COURT:  I don't think I have the post-arrest

12  statement.  What did Mr. Dabidah tell the arresting officers?

13             MR. WILLIAMS:  That his interests in this piqued

14  through an exposure through social media.  That was the extent

15  of the introduction.

16             THE COURT:  So he is an enthusiast?

17             MR. WILLIAMS:  That is what he stated, your Honor.

18             THE COURT:  Okay.

19             MR. WILLIAMS:  And again, over a two-year period, if

20  there was something more to that, I believe something more

21  concerning would have popped up.

22             Ultimately, the question for the Court is whether the

23  government has proven by clear and convincing evidence that

24  Mr. Dabidah is a danger and, by a preponderance, that he is a

25  flight risk; and not only that, but that there are no

1  conditions or combination of conditions that would adequately

2  appease those concerns, if those are concerns of the Court.

3  And it is our position that the government has not met either

4  burden.

5        With respect to dangerousness, we have addressed that

6  the government's main argument is that the nature of this

7  offense warrants detention.  However, without more, it is our

8  position that the charge alone should not warrant detention.

9  This is a rarely-charged statute in this district, and even

10  amongst that, we have cited to several cases where bail was, in

11  fact, granted where defendants have been charged with

12  possession of machine guns.  So it's not unprecedented to see

13  that happen in such cases, your Honor.

14        Additionally, this is a young man who has no prior

15  criminal history, no arrest record, no prior allegations of

16  violence or dangerous conduct.  This is a young man who's been

17  rather law-abiding for the vast majority of his life.  Despite

18  this one hiccup, your Honor, that he's been charged with,

19  there's nothing in his past that should present any concerns to

20  the Court.

21        So on that basis, your Honor, we do not believe that

22  there is enough evidence to support the fact that he is a

23  danger, and certainly not that there aren't conditions of

24  release that could appease any concerns of the Court.  The

25  proposed conditions we would have is that he would not possess

1    any firearms, firearm components, or a 3-D printer, which I do

2    think gets to the heart of what he's been charged with.

3         THE COURT:  I received just minutes ago from the

4    government a video, a brief video, and a map.

5         Mr. Xiang, what were those?

6         MR. XIANG:  So first of all, I apologize for sending

7    them so close to the hearing.  I was reminded that they

8    existed, and because there was an assertion that there was no

9    proof that the defendant used the gun, I was reminded that, in

10   fact, a video which had been produced to the defense about a

11   month ago showed an individual that -- it's sort of a dark

12   area, but it appears to be the individual, or if not the

13   defendant, someone else shooting a gun, kind of, into -- it's

14   at night, it's in Riverside Park -- and just kind of shooting

15   the gun into the distance.

16        The government is not contending this was a shooting

17   directed at a particular individual.  It appears to have been

18   toward the water.  But certainly it belies the notion that

19   these were guns that were, kind of, maintained solely for

20   academic interest that never saw the wild and that were never

21   used.

22        And so I think the defense was aware of this evidence

23   previously, but since I was going to mention it to your Honor,

24   I thought I would share it with the Court.

25        THE COURT:  And you can remain seated also, Mr. Xiang,

1    if you wish.

2            So is it still the case that the government has no

3    information that Mr. Dabidah ever sold any of these guns?

4            MR. XIANG:  So, your Honor, the investigation is

5    ongoing.  The arrest happened in August.  Even though the

6    conduct, we believe the evidence shows, occurred over a lengthy

7    period of time, it's not that we have been doing a two-year

8    investigation.  It's a relatively more recent investigation.

9            Look, I think --

10            THE COURT:  What insight can you give me into how the

11    investigation began?

12            MR. XIANG:  So my understanding from review of the

13    materials and conversing with my colleague who is handling this

14    case, and on trial, is that there came a time when law

15    enforcement became aware that there were numerous shipments of

16    these type, all going to the defendant's apartment.  And so

17    that was one investigative lead that was pursued.  And the

18    other was that there was these silencers from China, which were

19    intercepted, I believe, at the port of entry, at an airport,

20    that were intended for the defendant as well.  I believe that

21    was earlier this year.

22            And so to your Honor's original question about what is

23    the proof that he intended to sell the stuff, I think our

24    answer is, well, it's the same inference -- and we made this

25    point in our papers -- it's the same inference that we ask

1    jurors to draw all the time when someone's home, for example,

2    contains all sorts of drugs and drug paraphernalia.  I don't

3    think there needs to be direct evidence of, well, on such and

4    such a date the drugs were thereafter sold to this buyer and

5    that buyer, for the inference to be fair.

6         Look, what's the reason you have for several dozen

7    weapons, for multiple 3-D printers, for many rounds of

8    ammunition, for attempting to hide this stuff when law

9    enforcement comes to your door and calls you and says, Hey, we

10   are here to arrest you, come out, for you to delay, kind of,

11   interfacing with law enforcement, try to put the stuff away?

12   There is no other available inference.  The two inferences are,

13   you are going to use it yourself or you are going to provide it

14   to someone else, whether it's a sale or otherwise, for them to

15   use.  And both of those inferences, in the government's view,

16   go to dangerousness.

17        And I do want to address this point that, Well,

18   machine gun cases are rare.  I don't see -- the government

19   doesn't see why that would bear on the dangerousness argument.

20   Some statutes are rarely charged because certain serious crimes

21   occur less frequently than other serious crimes.  And as we

22   point out in our papers, with respect to machine guns in

23   particular, the type of gun, the type of firearm that is

24   capable of this type of fully-automatic fire, that technology

25   and how that comes about in the stream of commerce has

1    substantially changed over the past five to ten years.

2         There may have been a time in history when a machine

3    gun was what we think of when we think of TV or movies, and

4    those things were hard to get and hard to hide.  Now it's a

5    little accessory that's inserted into, whether it's a handgun

6    or an assault rifle, and suddenly it has the same operational

7    capacity as the big, scary weapons that we conceive of.

8         THE COURT:  Let me just talk about some of the

9    inferences that you raised.  There was the inference concerning

10   the amount of guns or partial guns, or guns in the process of

11   becoming guns, but -- I get the analogy to narcotics, but

12   ordinarily, you know, what we have is one individual with

13   several thousand dollars worth of cocaine or crack, and then

14   that provides a reasonable inference that they are for

15   distribution.

16        If you are a gun enthusiast -- I mean, I know any

17   number of gun enthusiasts in my life alone that have multiple

18   guns.  I am not appending that hobby, but it's not unusual.  So

19   that's an equally plausible inference as to why Mr. Dabidah was

20   in the process of making several guns.

21        And then with respect to the inference of -- you know,

22   concerning the amount of time it took him to respond to the

23   door when the police or law enforcement announced themselves, I

24   think the reasonable inference is that he was probably trying

25   to hide the evidence, the contraband because, obviously, it's

OB7LDabH

1    illegal.  Presumably he knows that it's illegal.  But there is

2    no evidence that he actually destroyed anything, is there?

3           MR. XIANG:  I will go through your Honor's questions

4    in that order.

5           On the distinction between this and, kind of, the sort

6    of case that your Honor has in mind anecdotally about friends

7    or otherwise, keep in mind, this is not a gun case.  This is a

8    machine gun case.  And I would venture to say that none of your

9    Honor's friends, or anyone who is a lawful gun owner, has a

10   machine gun because, in point of fact, no one is permitted to

11   have a machine gun.

12          THE COURT:  No one is permitted to have ghost guns

13   either, right?

14          MR. XIANG:  Correct, your Honor.  These are ghost

15   machine guns.  So either on the machine gun metric or the ghost

16   gun metric, this is per se unlawful in a way that, you know,

17   possession of a hunting rifle or even, you know, a handgun

18   that's appropriately permitted is not, you know, per se

19   unlawful.

20          As to the point about, well, he didn't destroy

21   anything, your Honor, a couple minutes, you know, between -- he

22   knows the agents are at the door.  These are large objects.  I

23   mean, some of the switches are smaller, but it's not like there

24   was a furnace available where he could have burned them or

25   melted them in that span of time, and so he did what he could.

1  I mean, as folks who believe they are imminently about to be

2  caught, you know, as your Honor is familiar in drug cases, they

3  try to flush things down the toilet if things can go down the

4  toilet.  Right?

5         THE COURT:  Right.

6         MR. XIANG:  Here, you can't flush a giant assault

7  rifle down the toilet.

8         THE COURT:  So you found some of the contraband in

9  areas where you believe he might have tried to secrete it, but

10  you also -- there was also contraband in his bedroom, correct?

11         MR. XIANG:  Yes, but a smaller number, your Honor.

12  Yes.

13         THE COURT:  Okay.  Now, can I just ask you about the

14  switches?

15         MR. XIANG:  Yes.

16         THE COURT:  How big are those things?

17         MR. XIANG:  I think they are about this big.  And

18  again, I may be imprecise as between the version that one

19  inserts into a handgun versus the version that one inserts into

20  a rifle.  I think the handgun versions are commonly called

21  Glock switches, and the rifle versions are called auto sears.

22  Operationally, they do the same thing to the gun.

23         THE COURT:  But they are small?

24         MR. XIANG:  They are small.

25         THE COURT:  And there were several dozen that were

1  seized from the apartment?

2          MR. XIANG:  Yes, your Honor.  There were 39 total

3  seized; 31 Glock switches and --

4          THE COURT:  Those little switches by themselves are,

5  technically speaking, machine guns pursuant to the statute?

6          MR. XIANG:  Correct, your Honor, because the statute

7  defines machine guns not only as the guns that are capable of

8  fully automatic fire with a single trigger pull, but any

9  component part that enables them to do that.

10         THE COURT:  Okay.

11         MR. XIANG:  So each of those is a machine gun, but

12  even if we are talking about the, sort of, lay or colloquial

13  understanding of machine gun as the gun itself that does the

14  thing, there were 14 fully assembled ghost guns of which six

15  had the switches installed, so six machine gun-capable

16  handguns, and two, kind of, machine gun-capable assault rifles

17  out of the five overall assault rifles.  And I am not counting

18  here, like, frames and receivers and other kind of parts.  We

19  are talking fully built-up guns.

20         Look, I think a big part of the government's argument

21  here, and I think it's clear from Judge Cave's remarks that

22  this she found very compelling, is that unlike the typical gun

23  case where we are talking about a, quote, unquote, "traditional

24  gun," a Glock, or even an assault rifle, there are some

25  real-world impediments to, if someone is out in the world, can

1   they get it again; if they are on home incarceration and they

2   are, obviously, not venturing out to any gun shops, or

3   whatever.

4       This type of gun conduct is almost impossible to

5   police because all it really takes is an internet connection,

6   and that's something that, in the government's experience --

7   and, obviously, pretrial is here.  They can speak for

8   themselves, but I think it's fair to say, in pretrial's

9   experience, it is extremely difficult to prevent someone who is

10  out on bail, under any set of conditions, whether it's ankle

11  bracelet, home incarceration, home detention, whatever, to

12  prevent them from using either their own device or a device of

13  someone they live with to access the internet to further the

14  crime.  And here, that's really all it takes.  All these

15  things, you or I could literally go online right now and order

16  these parts and do this ourselves.

17      THE COURT:  Where would I order that from?

18      MR. XIANG:  I think -- depending on which of these

19  things we are talking about, some of the things are just on

20  Amazon.

21      THE COURT:  So I can buy one of these switches on

22  Amazon, a switch that converts a Glock into a machine gun?

23      MR. XIANG:  I think you can buy a 3-D printer on

24  Amazon, and I think if you simply Google, like -- my

25  understanding of how this works is, basically, there are

1   software files that you load into your 3-D printer, and then

2   you separately order the material out of which the thing is

3   built, whether it's --

4           THE COURT:  So you can 3-D print a switch?

5           MR. XIANG:  Yes, your Honor.

6           THE COURT:  Or a sear?

7           MR. XIANG:  Yes, your Honor.

8           THE COURT:  Okay.

9           MR. XIANG:  And there are also websites which, again,

10  if the Court Googles you can do right now, to get, you know,

11  frames or receivers, or something just short of a frame or

12  receiver, where you need to drill one hole, and then it's good

13  to go.  And so this is not something that requires a whole lot

14  of technical know-how or expertise.

15          THE COURT:  Anyone can do it?

16          MR. XIANG:  Anyone can do it.  So that's the problem

17  here, your Honor.

18          THE COURT:  Well, except, if anyone can do it, then

19  everyone can do it.

20          I guess what I am trying to get at is, what makes this

21  case and this particular defendant, his involvement, so

22  nefarious that he ought to be incarcerated prior to trial?

23          MR. XIANG:  Well, I think two things.  I think, one,

24  the length of the conduct.  Again, this is, at least according

25  to the government's investigation so far, conduct that appears

1  to have occurred over a two-year period, 90 different

2  shipments.  So it's not one incident or five incidents, or even

3  ten incidents.  It's at least 90 shipments of stuff.

4      THE COURT:  When you say "stuff," what is your

5  evidence?  What is this stuff?

6      MR. XIANG:  You know, we have issued subpoenas to the

7  various online retailers that provided these materials.  You

8  know, this includes the 3-D printers, the materials that the

9  3-D printers use to do the printing.  And, you know --

10      THE COURT:  Is that like a plastic or is that like a

11  metal, or do you know?

12      MR. XIANG:  I don't want to speak out of turn.  I

13  think it's a polymer, I think is the term that's sometimes

14  bandied about.

15      THE COURT:  That's not illegal to own?

16      MR. XIANG:  No.

17      THE COURT:  The 3-D printer is not illegal to own?

18      MR. XIANG:  No, it's not, your Honor.

19      And, you know, I take your Honor's point, which is,

20  Well, if it's so easy to do, doesn't that cut against

21  detention?  And I think the government's response is, actually,

22  it cuts the other way.

23      Usually, when there is criminal conduct that's hard to

24  do, that difficulty, that kind of barrier to entry in either

25  entering that criminal conduct, or reentering that criminal

 1   conduct if one is bailed, that gives the Court, that gives the

 2   government some assurance that, look, this person has now been

 3   arrested, they are now under certain conditions, and it's hard

 4   for them to resume the crime.

 5         Here, it's very easy to resume the crime, I think is

 6   the government's point.  And this is a crime that Mr. Dabidah

 7   has engaged in for a long time.  And again, an international

 8   shipment of silencers from another country, that is not, you

 9   know, a kid who is messing around and, you know, happens to be

10   more mixed up than he intended in the first place.  This

11   happened over a substantial period of time.

12         THE COURT:  And over that period of time, you have no

13   evidence that he actually sold or tried to sell, et cetera, or

14   solicited the purchase of any of these materials?

15         MR. XIANG:  Again, not direct evidence in the way that

16   your Honor is describing, but again, we would argue that the

17   fair inference is that that was the intent.

18         THE COURT:  Okay.  Mr. Williams.

19         MR. WILLIAMS:  Thank you, your Honor.

20         I would just go back to our original point that when

21   you have a sample size of two years, if the inference was that

22   he was selling these parts or these firearms, you would see

23   some evidence of that.  To use the government's analogy of drug

24   trafficking, if someone was trafficking in drugs for over two

25   years, you would see some evidence of phone calls.  You would

1   see some evidence of a sale.  The fact that there is nothing

2   here, I think that cuts against any inference that the

3   government is claiming that the Court should make.

4           Similarly, with respect to the idea that he was going

5   to use this to threaten someone or hurt someone, there's been

6   no evidence of that.  The government did present a video of

7   someone looking like they -- looks like they test fired a gun

8   into the water.  That evidence was before the magistrate judge,

9   and our argument was not that this firearm has never been used.

10  It has not been used against another person.  It has not been

11  used as a threat against another person.

12          In the absence of any evidence of sales or threats

13  against another person, I think the fair inference is the third

14  one that your Honor raised, which is, this may be an

15  enthusiast.  And despite the fact that he may not have been

16  allowed to possess these items, it does not necessarily suggest

17  that he was going out to traffic these firearms or to use them

18  in any way that -- in a violent way.

19          So for those reasons, your Honor, we do believe that

20  there are conditions of release that the Court could impose.

21  And in terms of the government's argument that he may destroy

22  evidence if released, the government has completed its

23  execution of the search warrant at the home.  Quite frankly, I

24  don't know what Mr. Dabidah could destroy, if that was even a

25  concern at this point.

1       THE COURT:  Well, I did not understand Mr. Xiang to

2  pursue that argument.  Did you mean to, Mr. Xiang?

3       MR. XIANG:  It's in our papers, your Honor.  I think

4  our point on this is, the government, you know, learns things

5  about criminal conduct over time, and it's not unusual for us

6  to be aware of a premises and not another, and as -- you know,

7  we have executed a search warrant on an electronic device that

8  we are still going through, and it wouldn't be unusual if, as

9  we are going through that, we discover, oh, there is another

10  premises.

11       Obviously, before we can get to it, someone who is

12  aware of where other evidence may be found, who is at liberty,

13  could make arrangements for that evidence to either be

14  destroyed or moved, or whatever.  And that's equally true of

15  any, you know, online accounts, other devices of which we are

16  unaware that may be out there.  I have nothing specific to

17  proffer to the Court.  Obviously, if we were aware of any such

18  thing, we would have written on it already.

19       THE COURT:  Okay.

20       MR. XIANG:  But I think it's not fair to say, well,

21  they have already executed a search warrant, therefore, there

22  is no evidence that could possibly be destroyed.  I mean,

23  that's not what happens in these cases.

24       THE COURT:  Right.  And arguably, if there was another

25  person at another premises who was aware of Mr. Dabidah's

1   arrest, that evidence could have already been destroyed.

2            MR. XIANG:  That's correct, your Honor.  That's

3   certainly possible.

4            THE COURT:  And again, to be clear, so far as you are

5   aware, this is Mr. Dabidah's first arrest even, correct?

6            MR. XIANG:  I believe that's right.  But let me just

7   check with the pretrial report, if I may.

8            THE COURT:  Okay.

9            MR. XIANG:  That's correct, your Honor.  It's his

10  first arrest.

11           THE COURT:  Ms. Mayer, I read the report, the pretrial

12  services report.  I take it it's still your office's view that

13  there are conditions that could be imposed that will ensure

14  that Mr. Dabidah returns to court and that will not endanger

15  the community.

16           OFFICER MAYER:  That's correct.  We stand by our

17  recommendation.

18           THE COURT:  Well, I have reviewed the report.  I have

19  reviewed the transcript of the original bail hearing before

20  Magistrate Judge Cave, and I respectfully disagree that the

21  facts of this case suggest that Mr. Dabidah is a danger to the

22  community.  Clearly, he is involved in creating very dangerous

23  weapons.  Clearly, there were multiple weapons that were seized

24  from the premises, both completed and in the process of being

25  completed.  And we can certainly infer that there was, maybe,

1   an intent to sell, but there is no evidence that he ever sold

2   any of these weapons.  There is no evidence that any of these

3   weapons were ever used in connection with any crime and,

4   therefore, I do not believe that he is a danger to the

5   community.

6          On risk of flight, Mr. Dabidah is essentially a

7   lifelong resident of the Bronx.  He's been living in the Bronx

8   since he was two years old, I believe.  He lives with his

9   mother, and his mother is willing to bring him back into the

10  apartment if he is to be released.  And because there is no

11  evidence whatsoever, aside from the nature of the weapons that

12  he was manufacturing, if he was manufacturing them, no evidence

13  of any violence, I do believe that conditions can be

14  established that will both assure the safety of the community

15  and Mr. Dabidah's return to court.

16         Now, there is a recommendation by probation -- and

17  Mr. Williams, was your recommendation consistent with the

18  recommendation by pretrial services?

19         MR. WILLIAMS:  Yes, your Honor.  We had recommended a

20  $25,000 bond.  I think pretrial recommends one person.  I would

21  agree with that.

22         With respect to the other recommendations, we would

23  agree with that.  If the Court wanted to add a provision about

24  not possessing a 3-D printer, we would be fine with that as

25  well.

1          THE COURT:  Okay.  I would include that provision.

2          Ms. Mayer, what can you tell me about your office's

3   ability to monitor/restrict the use of the internet?

4          OFFICER MAYER:  We typically use computer monitoring

5   for sex offense cases, not so much for machine gun cases.  I am

6   happy to consult with our specialist to see if that's something

7   that we can do.

8          THE COURT:  I missed the first part.  You typically

9   use computer monitoring in what cases?

10         OFFICER MAYER:  Sex offense cases.

11         I am happy to consult with a specialist to see if we

12  could do that, but we typically install the software in one

13  internet-enabled device.  I am not sure if we can monitor it

14  for a machine gun case.  I am happy to find out.

15         THE COURT:  You would know what precisely would be

16  used, I take it.  Like, you would know if a particular polymer

17  was being ordered.

18         OFFICER MAYER:  Possibly.

19         MR. XIANG:  Your Honor, if I could be heard just on

20  that point.

21         THE COURT:  Sure.

22         MR. XIANG:  I am familiar, having handled a gun

23  trafficking case before Judge Castel, in which that condition

24  was imposed on one of the gun trafficking defendants.  Indeed,

25  as it turns out, that person attempted to use the monitor

1    itself, not for gun trafficking, but for drug trafficking.  So

2    I believe it is feasible to do that.  And I believe if the

3    Court's condition were, you know, not polymer or something

4    specific, but simply, You cannot use the internet either for

5    any purpose or for any purpose apart from A, B, C, and D, then,

6    you know, visiting Amazon or visiting any website at which any

7    items of this nature could be ordered --

8              THE COURT:  Or ordering anything from the internet.

9              MR. XIANG:  Correct, your Honor.  Correct.

10             THE COURT:  Okay.  Let's do that.

11             Mr. Williams.

12             MR. WILLIAMS:  I think that may be a little bit broad,

13   your Honor, to say no ordering anything from the internet.

14             THE COURT:  It can happen.

15             MR. WILLIAMS:  That could include, like, food, your

16   Honor.  I would ask that the Court curtail that a little bit.

17             THE COURT:  No.

18             MR. XIANG:  As for cosigners, your Honor, the

19   government would respectfully request two to three cosigners.

20             THE COURT:  Mr. Williams, can you get more than one

21   cosigner?  I know that his mother is here today.

22             MR. WILLIAMS:  I would ask for just the one, your

23   Honor, and then perhaps a moral suasion cosigner as the second.

24   But the one --

25             THE COURT:  Who is the one?

OB7LDabH

1          MR. WILLIAMS:  Mom.

2          THE COURT:  His mother?

3          MR. WILLIAMS:  Yes.

4          THE COURT:  His mother works?

5          MR. WILLIAMS:  Yes.

6          THE COURT:  Okay.  We only need his mother.  Very

7    well.

8          Anything else?

9          MR. XIANG:  Not from the government.  Thank you, your

10   Honor.

11         THE COURT:  Okay.  So let's make sure everyone agrees

12   on the conditions, and fill out the paperwork.

13         Ms. Trotman, you are able to do that?

14         THE DEPUTY CLERK:  Yes.

15         THE COURT:  So we can get started, because I have a

16   2:30 that I am already 20 minutes late for.  Okay?

17         And Mr. Dabidah, obviously, you are being released

18   today.  It's very important that you keep in touch with your

19   pretrial services officer.  It's very important that you abide

20   by the conditions of your release.  And if you do anything to

21   violate the conditions of your release, you will be brought

22   back here, and you may be sent back to the MDC.  So please,

23   please, do abide by those conditions.

24         Ms. Mayer.

25         OFFICER MAYER:  Your Honor, one of the conditions

OB7LDabH

1   listed was the third-party custodian --

2          THE COURT:  I'm sorry?

3          OFFICER MAYER:  The third-party custodianship of the

4   mother, the defendant's mother, that's not ordered, correct?

5          THE COURT:  Is that something that you recommended?

6          OFFICER MAYER:  It was a recommendation in our report.

7          THE COURT:  Yes.  Just make sure that the parties

8   agree.

9          Okay.  So then fill that out.

10         Thank you to the marshals.

11         (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25