# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

---

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

July 31, 2025

**BY ECF**

The Honorable Edgardo Ramos
Southern District of New York
United States Courthouse
40 Foley Street
New York, New York 1007

Re:   **United States v. Fareed Dabidah**
       **24-CR-514 (ER)**

Dear Judge Ramos:

  Having just turned 23 years old, Fareed Dabidah is amongst the youngest individuals to appear before the Court. He has no prior juvenile record, he has never before been arrested, and there is nothing about his history that suggests he poses any risk of recidivism. Mr. Dabidah knows that he broke the law when he began printing 3-D firearm components out of his bedroom about a year ago. Importantly, he never sold these firearm components or had any plans to use them for violence; rather, this was an offense born purely out of a hobby that served as a creative outlet. Nevertheless, Mr. Dabidah is sorry for his actions, and he vows to put his giftedness with technology to a more positive use in the future.

  The three months that Mr. Dabidah spent in custody at the MDC is sufficient punishment for a victimless, non-violent offense. Since being released on bail in November of last year, he has completed a 14-week IT training program through Per Scholas, where he was valedictorian of his class. And because of that training program, he was also able to secure a paid internship with Catholic Charities, assisting with the organization's technological and data needs. Mr. Dabidah has thus taken full advantage of the opportunity the Court gave him on pretrial release, and has laid the groundwork for a budding career in tech. He now asks that the Court continue believing in him, and permit him to remain out of custody by imposing a sentence of time-served (3 months) followed by three years of supervised release.



I. **Background**

Mr. Dabidah is a 23-year-old young man who was born in Accra, Ghana. He immigrated to the United States with his family when he was about two years old, and quickly became a U.S. citizen. Since arriving in the United States, Mr. Dabidah has always lived in the Bronx, NY.

Mr. Dabidah describes his upbringing as largely uneventful. He was an average student, who went on to graduate from high school and briefly pursue higher education at Bronx Community College. He was involved in extracurricular activities, such as his school's art and graphic design program. And both of his parents worked hard to provide for he and his younger brother. Although Mr. Dabidah did not experience many of the same hardships that some of the individuals who regularly appear before the Court have faced, it is this stable upbringing and support system that should give the Court great confidence that he will not find himself in this position again in the future. Indeed, nothing from Mr. Dabidah's past suggests that this offense was anything more than someone who made a series of poor decisions due to his youthfulness. As Mr. Dabidah's mother shared in her letter of support, Mr. Dabidah has always been a gifted young man who was interested in building things:

> He has also showed a desire to become an Airplane Engineer and computer science specialist and using his talented gift from God, positively and lawfully as a good citizen of America and as well as serving his country. As early as in his Kindergarten years, his

2

> kindergarten teacher told me Fareed will be an engineer, taking seconds in fixing complicated puzzles at school, and assembling delicate airplanes and toys which I bought for him from toys R US as he was growing up.

*See* Exhibit 1 (Augustina Tetteh-Dabidah Letter). What he chose to build in this case, however, just happened to be illegal.

When asked about what led him down the path to this offense, Mr. Dabidah's answer is straightforward and consistent with the evidence produced in discovery. He was not selling 3-D printed firearm components, nor was he radicalized to use them for violence. Rather, unsatisfied with working as a custodian, and feeling like he was meant for more, he began searching for hobbies before stumbling upon 3-D printing on social media:

> Throughout my time working I always had a recurring thought I was meant for more than what I was doing. I began searching for hobbies. I came across 3D printing on social media and I thought to myself I'd like to try that. After ordering my first printer and filament I began printing test cubes to understand how the process works. 3D printing became an outlet for me as I was excited to see what I could create.

> When I started 3D printing, it was around 2023 and I had recently gotten out of a relationship. At that time, I was sad and wasn't excited about much, I think I was feeling depressed. I was isolating myself in my room and I don't remember having a friend group at that time either. I was coping in different ways and started looking for hobbies which was when I took on the hobby of 3D printing. It was something that made me happy and it gave me a sense of purpose.

*See* Exhibit 1 (Fareed Dabidah Letter). The government has searched and hypothesized about what Mr. Dabidah's intentions were in accumulating a mass of 3-D printed firearm components. The truth, however, is that there is simply no more to this story other than a young man pursuing a creative outlet. Mr. Dabidah accepts full responsibility for taking his creative outlet too far, but he maintains, as he always has, that he had no ill intentions.

Since being arrested in this case, Mr. Dabidah has had the unique privilege of experiencing life both inside and outside of federal prison. For three months, he was held at the MDC, where he was forced to reflect on his actions and decide what he would do differently once eventually released:

> When I was arrested on August 14th, 2024, I arrived at MDC Brooklyn later that day. Throughout my time at MDC, I reflected on the circumstances and decisions that got me there. I was upset and mad at myself for the selfish decisions I made. Putting my family in danger brought me grief every time I'd think about it. One day I came across a book about forgiveness and decided to read a bit from it. It was a good book so I thought I'd put it back because it could be of use to someone else who needs it. Eventually I had to switch cells and bunked up with an older gentleman who I found was reading the same book. I asked him if I could read it and did not stop until I completed it. With the knowledge from that book I learned to forgive myself and others. I used my pain to motivate myself to change

3

my behavior.

*See* Exhibit 1 (Fareed Dabidah Letter). Having seen what life was like on the inside, Mr. Dabidah knew that, if given the opportunity to be released on bail, he would do everything in his power to demonstrate to the Court that he had learned from his mistakes, and that he could use his gifts in a positive manner. And since being released on bail in November, he has delivered on that promise.

One of the first things that Mr. Dabidah did when he was released on bail was enroll in an IT program that he discovered on a poster after a meeting with his pretrial officer. This program, which was run by Per Scholas, offered tuition-free IT education for students interested in pursuing careers in tech. As someone who always had a gift in this area, Mr. Dabidah knew that this was the perfect fit. And thus, for fourteen weeks, he faithfully showed up to his classes, passed all of his examinations, became a mentor to other students, earned the honor of valedictorian, and walked away with a CompTIA A+ certification.

Two of Mr. Dabidah's supervisors in the program were so impressed that they were eager to write in support of one of their favorite students. *See* Exhibit 1 (Kyle James and Nigina Karimova Letters). They describe Mr. Dabidah as someone who always came to class with a positive attitude, who exhibited a quiet leadership, and who regularly looked out for others. They even tell a story of how Mr. Dabidah took one struggling student under his wing and helped him graduate, which was only possible because of Mr. Dabidah's selflessness:

> I am writing to speak from the heart about someone who truly left a mark on our classroom- Fareed Dabidah.
>
> During our time in the same academic program, I had the privilege of serving as a fellow instructor while Fareed was a student in our IT program. From the beginning, he showed a quiet kind of leadership not flashy or loud, but steady and sincere. He didn't try to outshine anyone; instead, he lifted others up. In a space filled with pressure and competition, Fareed was the calm, supportive presence that kept others going.
>
> I watched Fareed give his time freely staying after class to help peers who were struggling, encouraging others when they felt like giving up, and never once asking for credit. One moment that has stayed with me was when another student, overwhelmed and on the verge of dropping out, found a lifeline in Fareed. He checked in every day, patiently worked through material late into the evening, and, more importantly, reminded that student they mattered. That classmate graduated with us, and it was clear to all of us who had made that possible.
>
> Fareed went on to be named valedictorian of our class. But it wasn't the grades that earned him that honor it was his character. His graduation speech didn't boast of personal accomplishments. Instead, he spoke with humility, expressing gratitude to his peers and teachers, and encouraging everyone to believe in their worth, even when the world doesn't make it easy.

*See* Exhibit 1 (Nigina Karimova Letter).

4

Mr. Dabidah does not take for granted the opportunity that the Court gave him on pretrial release, and he wants to continue demonstrating that he was worth taking a chance on. The three months that he spent incarcerated at the MDC was sufficient to send him a message that his actions have consequences, and that his life can change in an instant. Mr. Dabidah has heard that message loud and clear, and moving forward, he vows to only use his giftedness in a lawful, productive manner:

> With my prior knowledge that I had when it came to 3D printing, it helped me excel in my IT program. I now know there are more positive ways to use my time instead of doing what I was doing in the past, like through the productive IT programs I've been doing.
>
> This case will be the last moving forward because I understand how the outcome of my actions may affect others. More importantly, I value the privilege I have as a citizen. I will use my experiences as a reminder that life can change in an instant and to be grateful for those who've given me the opportunity to become a better version of myself.

*See* Exhibit 1 (Fareed Dabidah Letter). For all of these reasons, he asks that the Court impose a sentence of time served (3 months) followed by three years of supervised release.

## II.     Offense Conduct

On August 14, 2024, Mr. Dabidah was arrested and charged with one count of possessing a machinegun. Specifically, Mr. Dabidah had amassed a sizeable collection of 3-D printed firearm components and machinegun conversion devices. While there is no evidence that Mr. Dabidah had ever utilized these machinegun-style weapons for violence, he acknowledges that possessing them alone was a serious offense, as in the wrong hands, these weapons could cause catastrophic damage.

Importantly, the government has conducted an extensive investigation, and there has been no evidence that Mr. Dabidah was trafficking these firearm components or providing them to a third party. Nor has there been any evidence produced suggesting that he had a sinister plan to use these weapons for violence. Instead, as Mr. Dabidah wrote in his letter to the Court, this offense was born out of a hobby that he discovered on social media that served as a creative outlet. He knew that what he was doing was illegal, but justified it by the fact that he was not hurting anyone. He now recognizes that, even if he was not hurting anyone, he was putting others in danger by the simple fact of the existence of these high-powered firearms. He is extremely remorseful and vows never to engage in such illegal conduct again.

## III.    The Court has Discretion to Impose a Below Guidelines Sentence

"A sentencing judge has very wide latitude to decide the proper degree of punishment of an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008). In exercising its discretion, courts must be "mindful of the fact that the Sentencing Guidelines are just that, guidelines, and that they are truly advisory." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (internal quotations and citation omitted). Moreover, the Second Circuit has "declined to adopt a presumption of reasonableness for sentences that fall within the

5

guidelines range." *Id.* (citation omitted).  Instead, the Second Circuit has championed "a more flexible approach that allows considerations of the facts of an individual case." *Id.*  Ultimately, courts are to use as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a), which directs sentencing courts to impose a sentence sufficient, but not greater than necessary to comply with the factors set out in 18 U.S.C. § 3553(a)(2)" – proportionality, deterrence, incapacitation, and rehabilitation.  *Id.* (internal quotations and citation omitted). Stated differently, the Court must "consider every convicted person as an individual" and its sentence must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011).

### IV.  The § 3553(a) Factors Support a Sentence of Time Served (3 Months)

In recommending a below Guidelines sentence of 36 months, probation acknowledges that there are significant mitigating factors at play.  Respectfully, however, probation's downward variance does not go far enough, as this recommendation is already predicated on an artificially inflated Guidelines range.  Here, Mr. Dabidah received an enhancement under the Guidelines that should be closely scrutinized in the context of this case.  Specifically, he received a six-point enhancement under §2K2.1(b)(1)(C) because his offense involved 25-99 firearms.  While this enhancement may be appropriate in cases involving gun trafficking -- since when one places more guns into the stream of commerce, they inherently increase the risk that those firearms will fall into the wrong hands -- this enhancement provides very little applicability to Mr. Dabidah's case since these 3-D printed firearms were merely the product of Mr. Dabidah's creative hobby.  Indeed, the government has presented zero evidence that Mr. Dabidah sold these components or otherwise had plans to use them for violence.  This certainly does not minimize the seriousness of his offense in any way, but considering that these firearms were never distributed, the fact that this offense may have involved one, fifty, or one hundred 3-D printed firearms provides very little distinction.

Similarly, it must be emphasized that while Mr. Dabidah is charged with possession of a machinegun -- namely, machinegun conversion devices -- none of these machinegun conversion devices actually qualify as firearms for purposes of the enhancement under § 2K2.1(b)(1)(C).[1]  In

---

[1] Section 2K2.1 employs, for different purposes, two distinct definitions of the term "firearm" drawn from separate statutory sources: 21 U.S.C. § 921(a)(3) ("Gun Control Act (GCA) definition of firearm") and 26 U.S.C. § 5845(a) ("National Firearms Act (NFA) definition of firearm").  One difference between the definitions is the inclusion of machinegun conversion devices (MCDs). Commonly referred to as "Glock switches" or "auto sears," MCDs are devices designed to convert weapons into fully automatic firearms.  The NFA definition of firearm includes "machineguns," 26 U.S.C. § 5845(a), and the definition of "machinegun" includes "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun," 26 U.S.C. § 5845(b). Therefore, MCDs fall within the NFA definition of firearm.  However, the GCA definition of firearm does not encompass MCDs.  *See* 21 U.S.C. § 921(a)(3).

Section 2K2.1 uses the NFA definition of firearm for certain enhanced base offense levels.  *See, e.g.*, USSG § 2K2.1(a)(1), (3), (4), and (5).  Therefore, those enhanced base offense levels apply to offenses involving MCDs.  However, the remainder of § 2K2.1, including the specific offense characteristics and the cross reference, uses the GCA definition of firearm.  USSG §2K2.1, comment. (n.1).  Therefore, MCDs do not trigger §2K2.1's specific offense characteristics or the cross reference.

other words, Mr. Dabidah's Guidelines range is being enhanced under this section not because he possessed multiple machinegun conversion devices, but instead because he possessed other 3-D printed firearm components that could not otherwise be charged as a standalone federal offense. Again, none of this minimizes the seriousness of Mr. Dabidah possessing a machinegun, but the seriousness of that offense is already captured by the increased base offense level under § 2K2.1(a)(5).

Setting the Guidelines aside, the § 3553(a) factors support a sentence of time served (3 months). To begin with the nature and circumstances of the offense, while firearms do pose a risk of violence, this was a victimless, non-violent crime. Indeed, there is no evidence that Mr. Dabidah was engaged in the trafficking of firearms or that he was planning to use the guns for violence. To the contrary, as he shared with the Court, 3-D printing became a hobby and creative outlet for him that he admittedly took too far. Importantly, no one got hurt, and he had no intent to hurt anyone. Under these circumstances, a sentence of time served can be more than justified.

Turning to Mr. Dabidah's history and characteristics, he is an extremely young man facing his first ever criminal conviction. He is only 23 years old, and this offense occurred when he was just 22. Considering that he has no prior criminal history, and not a single run in with the law as a juvenile, this offense can likely be attributed to poor decision making associated with his youthfulness. Moreover, nothing about his past suggests that he has a propensity for violence or that a felony conviction and the three months he spent at the MDC would be insufficient to correct his behavior moving forward. To that last point, Mr. Dabidah has performed exceptionally on pretrial release, including furthering his education through the Per Scholas IT program, becoming the valedictorian of his graduating class, demonstrating his leadership skills through tutoring other students, and taking the initiative in pursuing internship opportunities. Mr. Dabidah has shown not only that he can be trusted in the community, but that he can also be an asset to the community. Accordingly, this factor too supports a time-served sentence.

In terms of the need to afford adequate deterrence, any time in custody for a first-time, non-violent offender -- and particularly for someone as young as Mr. Dabidah -- has strong deterrent value on its own. And as he expressed in his letter to the Court, the three months that Mr. Dabidah already spent at the MDC was an eye-opening experience that forced him to reflect on his actions and come to the decision that this was not where he wanted to end up in the future. Considering his performance on pretrial release, and the initiative he has taken in furthering his education, it appears that any message of deterrence has been well received.

Moreover, general deterrence, as a threshold matter, is "a phenomenon that is notoriously difficult (and perhaps) impossible to measure." *See United States v. Brady*, 2004 WL 86414, at *9 (E.D.N.Y. Jan. 20, 2004). Indeed, the very idea of general deterrence is premised on the

---

For example, an individual convicted under 18 U.S.C. § 922(o) for possessing five MCDs would receive an enhanced base offense level because the offense involved a firearm described in 26 U.S.C. § 5845(a). *See* USSG §2K2.1(a)(5). However, this individual would not receive an enhancement under §2K2.1(b)(1) for the number of firearms involved in the offense because the MCDs are not firearms under the GCA definition. *See* USSG §2K2.1(b)(1). Accordingly, Mr. Dabidah's possession of multiple MCD's does not trigger an enhancement under § 2K2.1(b)(1)(C).

erroneous idea that would-be offenders can anticipate what punishment they might receive. But as we know, "[since] consequences for the same federal offense vary widely from one judge to the next, deterrence is undermined because a defendant who comes up for sentencing has no way of knowing or reliably predicting whether he will walk out of the courtroom on probation, or be locked up for a term of years that may consume the rest of his life, or something in between." *See United States v. Cavera*, 550 F.3d 180, 223 (2d Cir. 2008) (Sotomayor, J., concurring in part) (internal quotations and citation omitted). It is for this very reason that individuals who come before the Court are warned that no one can reliably predict what their sentence will ultimately be.

Consistent with the above, the Vera Institute of Justice has found that more severe sentences do not deter crime:

> The concept of deterrence seems intuitive: if punishments are more severe, people will stop committing crimes because the consequences are so dire. Deterrence theory was part of the rationale for lengthening and increasing the surety of sentences to incarceration through the expansion of mandatory minimums in the 1980s and 1990s. Study after study, though, has shown that people do not order their unlawful behavior around the *harshness* of sentences they may face, but around their perceived likelihood of being caught and facing *any* sentence. First, the general public's knowledge of, or even an individual's familiarity with, the specific criminal sanctions set by legislatures is often limited at best. Second, most people are deterred from engaging in unlawful behavior not because they fear a particular sanction but simply because they know the behavior is prohibited. A 2013 meta-analysis of studies on deterrence concluded that "it is clear that lengthy prison sentences cannot be justified on a deterrence-based, crime-prevention basis."

*See* Exhibit 2 (Vera Institute Sentencing Report) at pg. 23. Sentencing Mr. Dabidah to an additional term of imprisonment under the guise of deterrence would thus not have the impact that the Court intends.

Finally, while the charge of possession of a machinegun is not one that is common within our District, Courts in this District routinely sentence defendants in non-violent firearm possession cases well below their Guidelines range and, in many instances, to time served. For example, in fiscal year 2024, this District imposed a sentence in 123 firearm cases. In those cases, 56.9% of defendants were sentenced below their advisory Guidelines range. *See* Exhibit 3 (2024 Sentencing Commission Data). Similarly, in fiscal year 2023, 50.4% of defendants facing gun charges were sentenced below their advisory Guidelines range. *See* Exhibit 4 (2023 Sentencing Commission Data). As such, a sentence below the Guidelines, including sentences of time served, would be in line with District norms. *See, e.g., United States v. Minaya*, 19-CR-487 (CM), ECF No. 30 (S.D.N.Y. Oct. 13, 2021) (sentencing a defendant with a Guidelines range of 37 to 46 months to time served (less than one month in prison)); *United States v. Mouzon*, 16-CR-284 (CM), ECF No. 53 (S.D.N.Y. Mar. 27, 2017) (sentencing a defendant with a Guidelines range of 30 to 37 months to time served (zero months in prison)); *United States v. Nivar*, 19-CR-902 (AT), ECF No. 37 (S.D.N.Y. Jul. 29, 2021) (sentencing defendant with a Guidelines range of 33 to 41 months to time served (less than six months in prison)); *United States v. Garcia*, 18-CR-178 (AT), ECF No. 44 (S.D.N.Y. Apr. 17, 2019) (sentencing defendant with a Guidelines range of 24 to 30 months to time served (zero months in prison); *United States v. Robinson*, 16-CR-235 (PAC), ECF No. 31

(S.D.N.Y. Feb. 10, 2017) (sentencing a defendant with a Guidelines range of 15 to 21 months to time served (less than three months in prison); *United States v. Baez*, 22 Cr 264 (KPF), ECF No. 27 (S.D.N.Y. June 14, 2023) (sentencing a defendant with a Guidelines range of 15 to 21 months to time served (zero months in prison)); *United States v. Wayne*, 22-CR-631 (PGG) (sentencing a defendant with a Guidelines range of 46 to 57 months to time served); *United States v. Fayton*, 23-CR-001 (sentencing a defendant with a Guidelines range of 21 to 27 months to 5 years of probation); *United States v. Aramboles*, 23-CR-643 (AS) (sentencing defendant with a Guidelines range of 12 to 18 months to time served (four months in prison)); *United States v. Cheatham*, 23-CR-027 (JPO) (sentencing defendant with a Guidelines range of 57 to 71 months to time served (zero months in prison); *see also United States v. Burdge*, 16-CR-078 (LGS) (sentencing defendant convicted of possession of a machinegun to 6 months in prison); *United States v. Hankewycz*, 19-CR-649 (KMK) (sentencing defendant convicted of possession of a machinegun to 6 months in prison).  Mr. Dabidah's case should be no exception.

## V.    Conclusion

For all of the reasons stated herein, including Mr. Dabidah's age, the non-violent nature of his offense, the lack of evidence of firearms trafficking, his performance on pretrial release, and the precedent in this District for non jail sentences in firearm possession cases, Mr. Dabidah respectfully asks the Court to impose a sentence of time served (3 months) followed by three years of supervised release.

                                            Respectfully Submitted,
                                            /s/
                                            Kristoff I. Williams
                                            Assistant Federal Defender
                                            Federal Defenders of New York
                                            (212) 417-8791