UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 24 CR 514 (ER)

FAREED DABIDAH,

Defendant. Sentence
------------------------------x

New York, N.Y.
August 14, 2025
11:30 a.m.

Before:

HON. EDGARDO RAMOS,

District Judge

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
BY: ANDREW JONES
Assistant United States Attorney

FEDERAL DEFENDERS OF NEW YORK, INC.
Attorneys for Defendant
BY: KRISTOFF WILLIAMS

(Case called)

MR. JONES: Good morning, your Honor, Andrew Jones for the government.

MR. WILLIAMS: Good morning, your Honor, Kristoff Williams for Mr. Dabidah, who is present. We are also joined by his mother.

THE COURT: Good morning to you all.

This matter is on for sentencing.

In preparation for today's proceeding I have reviewed the following: I have reviewed the presentence report last revised on July 22, 2025 prepared by U.S. Probation officer Stephanie McMahon, which includes a recommendation. I've also reviewed the sentencing letter submitted by Mr. Williams, dated July 31, 2025, which includes letters submitted by Mr. Dabidah himself, his mother, and a director and instructor with an organization called Per Scholas, which, as I understand it, is an IT training institution, and it also includes several sentencing studies by the U.S. Sentencing Commission and the Vera Institute, and I have reviewed the government's letter filed on August 7, 2025.

Is there anything else I should have received or reviewed in connection with the sentencing, Mr. Jones?

MR. JONES: Not from me, your Honor.

THE COURT: Mr. Williams.

MR. WILLIAMS: No, your Honor.

THE COURT: Very well.

Mr. Williams, have you read the presentence report and discussed it with your client?

MR. WILLIAMS: I have, your Honor.

THE COURT: By the way, everyone can remain seated. You don't need to stand.

Mr. Dabidah, have you read the presentence report and discussed it with your attorney?

THE DEFENDANT: Yes, I have.

THE COURT: Are there any objections to the report concerning its factual accuracy, Mr. Jones?

MR. JONES: No, your Honor.

THE COURT: Mr. Williams.

MR. WILLIAMS: No, your Honor. There will be some objections I raised to the fine and some of the supervised release conditions, but that can be handled later.

THE COURT: Very well.

Although I am not required to impose a sentence within the sentencing range calculated under the guidelines, I am required to consider the guidelines, and in order to do that I need to do the calculation.

Mr. Dabidah pled guilty to Count One of the indictment, which charged him with possessing multiple handguns that had been converted to operate as machine guns, in violation of Title 18, United States Code, Section 922(o).

I have reviewed the guidelines calculations set forth at paragraphs 25 to 36 of the presentence report and agree that the total offense level is 25.

I know that, Mr. Williams, you previously had objections to that calculation. Do you continue to object to the calculation set forth in the presentence report?

MR. WILLIAMS: No, your Honor.

THE COURT: Mr. Jones, do you have any objections to that calculation?

MR. JONES: No, your Honor.

THE COURT: Very well.

So the total offense level is 25. Because Mr. Dabidah has no prior convictions, he is in criminal history category I. And with a total offense level of 25 and a criminal history category I, the applicable guidelines range is 57 to 71 months.

Mr. Jones, do you wish to be heard prior to the imposition of sentence?

MR. JONES: Yes, I do, your Honor. As long as you can hear me, I would prefer to stand.

THE COURT: If you prefer to stand, that's fine.

MR. JONES: Thank you, your Honor.

Your Honor, there is a couple of things that I want to highlight for the Court. I know we put it in our sentencing submission. This conduct is terrifying. This is an arsenal of machine guns assembled by the defendant, nearly three dozen of

them, a variety of handguns and assault rifles, that are untraceable and capable of automatic fire.

The seriousness of the conduct here I think is what drives our belief that the guidelines sentence is the appropriate sentence. I note in the PSR, even if going below guidelines, that on this type of guidelines calculation most defendants, including those with no criminal history points, are receiving sentences in the range of 48 to 50 months. I think that's the median and the mean sentencing noted in the PSR.

Across the board this is significant conduct that deserves a meaningful term of imprisonment. The requested three-month sentence just doesn't address it.

Ghost guns are driving violent crime, machine guns are increasing violent crime, and assault rifles do as well. What we have here is a situation where the defendant is manufacturing and storing all of these together.

As I read it in the defense sentencing submission, their principal counterargument to this is this is not dangerous because this is a hobby. This is just a creative outlet, I think was the phrase that was used, and that just doesn't hold up.

I don't 3D print, so I don't pretend to know all of the intricacies of it. But if this is a creative outlet, there are nearly infinite things that you can create on a 3D printer

that are not lethal destructive machine guns.

Moreover, your Honor, on page 2 of our sentencing submission there is a picture in the top right corner. That is bags of ammunition, rifle and handgun ammunition. I believe it's also the press on the right, the items that you use to make your own ammunition.

So the defendant didn't just have guns that he had assembled. He had magazines in which to put ammunition, he had thousands of rounds of ammunition that he was also manufacturing himself, and he had two silencers. There is just simply no reason to have these items without running the huge risk of engaging in violence yourself or of selling them.

I concede some of the defense's points. I don't have evidence that the defendant sold these guns. He had a lot of them at his house. I showed the Court some evidence that he had taken them and used them himself. It's a video of the defendant firing the gun. I think it's going into the Hudson River. I am not saying he is shooting at somebody, but it's just that this isn't idle and this carries huge risk.

With that, your Honor, the dangerousness of the conduct -- I don't credit the idea that the defendant doesn't need specific deterrence. This is a young man who assembled this arsenal. Thank God he didn't use it, that we know of.

But I think a message does need to be sent to such a young person who is engaged in this conduct already to ensure

that whenever he's back in society that this isn't an issue that needs to be addressed again.

THE COURT: Thank you.

Mr. Williams, do you wish to be heard?

MR. WILLIAMS: Yes, your Honor.

For three months Mr. Dabidah was at the MDC, where he had to think about each day his actions that led him there. I've had conversations with him and it is something that really resonated with him, and he recognizes how seriousness of conduct he committed.

Any amount of time in prison, especially the MDC, I think, is difficult. And for someone who is so young, at 23 years old, I think that's a particularly eye-opening experience. He left that facility knowing that that's not somewhere where he wants to return.

I think Mr. Dabidah is in somewhat of a unique position. Most defendants do not spend months in pretrial custody and then get released partway through their case. Hence, most defendants don't get the opportunity to show the Court that the months that they have spent in prison was sufficient as a course-correcting measure. But Mr. Dabidah was in the position where he was released after about three months in custody. And since being released he has done tremendous work.

On the second page of our sentencing submission we

included a photograph of Mr. Dabidah wearing a sash, holding his valedictorian certificate, and that's a picture taken following his graduation from the Per Scholas program. We have also included letters of support from the instructors at that program who speak to his commitment, his leadership, and not just that, but his willingness to take other students under his wing to help them graduate as well.

This was only an opportunity Mr. Dabidah was able to pursue because this Court, in November of last year, believed in him, believed that he would be able to prosper on pretrial release, and I believe he showed that. And I don't think there is any reason why the Court should doubt that his positive trajectory would now all of a sudden change if given the opportunity to remain out of custody.

Furthermore, I do believe that the 3553(a) factors do support a sentence of time served.

Beginning with the nature and circumstances of the offense here, no one in this courtroom is going to dispute what the government said, that this was a dangerous offense. We all know that there is a reason why we ban automatic firearms in this country, and that's because there is great potential for danger there. Mr. Dabidah knows that and appreciates that full well.

At the same time, I believe the overarching dangerousness of this offense also must be weighed against the

specific circumstances at play here. As the government conceded, there is no evidence that Mr. Dabidah sold, trafficked, or otherwise distributed these firearms. There is also no evidence that he had planned to use or had used them in any semblance of violence.

While the government did include a screenshot from the video where Mr. Dabidah is seen firing one of the ghost guns, what that video actually shows is him firing a single shot from a nonautomatic weapon into the water. He was not aiming at anyone and this was not one of these automatic firearms equipped with a machine gun conversion device.

I don't think anything the government has presented necessarily undercuts what Mr. Dabidah represented, which was that he got into 3D printing and particularly 3D printing of firearms based on exposure to social media. Certainly we are not suggesting that that's OK, but I do think when you balance the specific circumstances that play here against the dangerous of the conduct, I do think that is a mitigating factor.

Moreover, just turning to Mr. Dabidah individually, he is a young man. This offense occurred when he was 22 years old. He is now 23. He has no prior criminal history, no history of violence, and he has shown tremendous promise on pretrial release.

I do think his youthfulness plays a big factor here. While the government argues that his youthfulness is one of the

reasons why a lengthier sentence is necessary, I think that runs counter to the aim of like keeping our youth out of the criminal justice system.

There is a reason why we have youth diversion programs. There is a reason why, even in this district, we have a Young Adult Opportunity Program. That is because there is an understanding that young people's minds and judgments are still being molded, and we do need to give them the opportunity to change outside of the criminal justice system.

I would submit that Mr. Dabidah is one of the youth that this Court should be willing to take a chance on. This Court believed in him back in November, and I don't think he has done anything that should undercut the Court's trust.

Finally, I do think there is precedent for giving a time-served sentence. While this is not a common offense prosecuted in this district, we pointed to several 922(g) cases. While this is not a 922(g) case, I do think it's a helpful parallel because ultimately this is a gun possession case, and there are several cases within this district where defendants, even with guidelines equivalent to Mr. Dabidah, have gotten time served sentences, and I cited to even two cases with machine gun offenses in this district where the ultimate sentence was six months each. I do think there is precedent for it. I think Mr. Dabidah has shown that this Court can trust him. He is not a danger, he is not a flight

risk, and he has shown that he is on a positive trajectory and is using his curiousness and giftedness with tech in a positive fashion.

For all those reasons, your Honor, we are asking the Court to impose a time-served sentence of three months.

THE COURT: Thank you, Mr. Williams.

Mr. Dabidah, you have an absolute right to address the Court before I impose sentence. Is there anything that you wanted me to know?

THE DEFENDANT: Yes. I would like to thank you, and I appreciate you for allowing me to go home to my family. I would like to thank you for allowing me to do something positive with my time at home. Thank you.

THE COURT: Can I ask you a question?

THE DEFENDANT: Yes.

THE COURT: To Mr. Jones' point, to the extent that you have interest in technology and a facility for technology, you could use a 3D printer to make a birdhouse.

Can you give me some explanation as to what drove you to try to create guns and machine guns?

MR. WILLIAMS: May I have one moment, Judge?

THE COURT: Sure.

MR. WILLIAMS: Thank you, your Honor.

THE DEFENDANT: Could you repeat that one more time, please.

THE COURT: Sure.

Why guns?

THE DEFENDANT: Prior to creating the firearms that I made, I did have interest in firearms. I didn't understand the legality of them, but I knew in New York State they were illegal. But it was just an interest that I had. I had a prior interest in firearms. That's all.

THE COURT: Thank you.

In deciding what sentence to impose, in addition to the sentencing guidelines and the commentaries thereto, I have considered all of the factors set forth in Section 3553(a) of Title 18 of the United States Code, including the nature and circumstances of the offense and Mr. Dabidah's history and characteristics. I have considered the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes, and to provide Mr. Dabidah with educational and vocational training in the most effective manner. I have considered the need to avoid unwarranted sentence disparities among similarly situated defendants and the need to provide restitution to any victims of the offense, and I have considered all of these factors.

It is my intention to impose a sentence of time served to be followed by three years of supervised release with a

special condition of six months' home detention. I will impose a fine of $3,000 and also the mandatory special assessment of $100.

Is the government seeking forfeiture?

MR. JONES: No, your Honor.

THE COURT: Or restitution, correct?

MR. JONES: That's correct.

THE COURT: I believe that this sentence is not greater than necessary to comply with the purposes of sentencing, as set forth in Section 3553(a), for the following reasons.

As we all appear to agree, what Mr. Dabidah did in this case was incredibly serious. I don't know that it rises, at least not to my mind, to the level of terrifying, but it was incredibly serious, and any number of very awful things could have happened with the guns that Mr. Dabidah produced, and he appears to understand that.

However, I do not believe that a sentence within the guidelines is appropriate primarily because, as the government acknowledges, there is no evidence that Mr. Dabidah intended to market or sell those weapons or that he ever intended to use them in connection with any criminal activity.

That, and the circumstances of his upbringing and the life that he was living, lends a great deal of credence to the explanation that he has provided to the Court, which is that he

was interested in guns and pursued that interest by trying to manufacture guns, and the fact that he obviously has no criminal record whatsoever, has never been arrested before.

Those things, combined with also the subsequent efforts that he undertook after his arrest with Per Scholas, and I read the letters of those two individuals very, very carefully, suggest to me that we should believe him when he told us that he had no intention of engaging in any criminality beyond the manufacture and possession of those weapons.

It's an aberrational and certainly a curious crime, and I don't deny the seriousness of the offense, but I have to consider the person at the center of this, and this person at least, based on what's before me, does not suggest to me that this was a person who was -- despite the fact that there is no evidence, he was not going to either sell or market or use these weapons in a criminal fashion.

I believe that specific deterrence is necessary. As Mr. Jones indicated, Mr. Dabidah is a very young man. That to me suggests that it should weigh in favor of giving him the opportunity the continue the track that he has been on since his arrest, getting the certificate or whatever license he did from Per Scholas, continuing to abide by the conditions of his pretrial release. He will be continuing under those conditions, for the most part, with the six months of home detention. He will be able to work during that time and to

attend whatever medical or religious appointments and obligations he otherwise has. But he will be at home.

I don't think that general deterrence requires that he be incarcerated. Again, he has spent three months at the MDC. To the extent that anyone intends to engage in similar conduct with an eye towards selling or using these weapons, they will obviously be in a very, very different situation.

For all of those reasons, I think it is not necessary to incarcerate Mr. Dabidah any further, that this was, again, to my mind, a largely aberrational period in his otherwise law-abiding life.

With that, does counsel know of any other reason or legal reason why I should not impose the sentence as I have indicated?

Mr. Jones.

MR. JONES: No, your Honor. Is the Court intending to impose additional special conditions of supervised release?

THE COURT: Yes.

MR. JONES: Then no legal reason not --

THE COURT: Very well.

Mr. Williams.

MR. WILLIAMS: No, your Honor.

THE COURT: In that event, it is the judgment of the Court that you be sentenced to time served, to be followed by three years of supervised release with a special condition of

six months' home detention. You will be allowed to work and to attend to any medical or religious obligations that you may have during that time. The standard conditions of supervised release will be imposed. Those conditions are set forth at pages 27 and 28 of the presentence report and are incorporated in their entirety herein.

Mr. Williams, do you wish public reading of the standard conditions?

MR. WILLIAMS: No, your Honor.

THE COURT: The mandatory conditions will also apply. They are set forth at pages 26 and 27 and are included in their entirety herein, and they are that you must not commit another federal, state, or local crime, you must not unlawfully possess a controlled substance, and you must refrain from the unlawful use of a controlled substance and must submit to one drug test within 15 days and at least two periodic drug tests thereafter, as determined by probation.

The following special conditions apply.

Mr. Williams, you said you had objections to some of the special conditions?

MR. WILLIAMS: Yes, your Honor.

In light of the fine, I have no objections to the two financial conditions. To the outpatient treatment, I believe the only evidence is marijuana use. I don't know that that rises to the need of outpatient drug treatment. He will be

subjected to testing, but I don't know that outpatient treatment would be necessary, so that would be my objection.

THE COURT: Mr. Jones.

MR. JONES: I don't have a view on this, your Honor.

THE COURT: Very well.

I will not require you to engage in the outpatient treatment for drug testing.

Anything else, Mr. Williams?

MR. WILLIAMS: No, your Honor.

THE COURT: So the first special condition is that you must perform 100 hours of community service at a rate of 50 hours per year over the three years that you are on supervised release, to be approved by the probation officer, and this condition is appropriate in order to assist you in giving back to the community and developing prosocial skills and fostering relationship building.

MR. JONES: Your Honor, can I ask a question on that condition?

THE COURT: Yes.

MR. JONES: Because probation had written it for two years, I think there is a math disconnect between 100 hours and 50 hours a year. I was wondering if the Court could clarify if it's 50 hours a year for three years or 100 hours total.

THE COURT: One hundred hours total. Yes.

The next condition is that you must submit to a search

of your person, property, residence, office, vehicle, papers, computers, cell phones, and other devices or media used for electronic communications, data storage, cloud storage, or network storage. The probation officer may conduct a search under this condition only when there is a reasonable suspicion that you have violated a condition of your supervision or committed a crime and that the areas to be searched contain evidence of the violation of the crime. The search must be conducted by a U.S. probation officer, although other law enforcement officers may assist the probation officer. The search must be conducted at a reasonable time and in a reasonable manner.

Failure to submit to a search may be grounds for revocation of release, and you must warn any other occupants of the premises that the premises may be subject to searches under this condition. This condition is appropriate because the offense involved possession of firearms and to assist probation in providing protection to the community and detecting if the defendant is engaged in similar activities.

The next condition is that you must not incur new credit card charges or open additional lines of credit without the approval of the probation officer unless you are in compliance with the installment payment schedule. Separately, you must provide the probation officer with access to any requested financial information. These two conditions are

appropriate because I am imposing a fine, and they will assist probation in monitoring your compliance with the criminal financial penalties imposed.

Finally, if you live outside of the Southern District of New York, it is recommended that you be supervised by the district of residence.

As I indicated previously, I need to impose the $100 special assessment, which shall be due immediately, and a fine of $3,000. The fine must be paid in monthly installments of 15 percent of gross monthly income over the period of supervision to commence 30 days after the date of judgment.

I previously discussed I will not impose restitution or forfeiture.

Are there any open counts?

MR. JONES: There are not, your Honor.

THE COURT: That constitutes the sentence of the Court.

Mr. Dabidah, you have a right to appeal this sentence. However, there are strict time limits within which you must perfect that appeal.

Mr. Williams, will you assure me that you will promptly and thoroughly discuss with Mr. Dabidah his appellate rights?

MR. WILLIAMS: Yes, your Honor.

THE COURT: Any other applications?

MR. WILLIAMS: No, your Honor.

THE COURT: Mr. Jones.

MR. JONES: No, nothing for me.

THE COURT: In that event, we are adjourned.

Mr. Dabidah, good luck to you, sir.

(Adjourned)